# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
## EASTERN DIVISION

| | |
|---|---|
| LYNNE REED, )<br><br>     Plaintiff, )<br><br>vs. )<br><br>ROLLA 31 PUBLIC SCHOOL )<br>DISTRICT, et al., )<br><br>     Defendants. ) | Case number 4:03cv1690 TCM |

## MEMORANDUM AND ORDER

This action is before the Court[1] on the motion of defendants, Rolla 31 Public School District and the members of its Board of Education,[2] requesting summary judgment on the claims of plaintiff, Lynne Reed, that (1) her employment contract was not renewed because of her sex, in violation of the Missouri Human Rights Act (MHRA), Mo.Rev.Stat. §§ 213.010-.137[3]; (2) her contract was not renewed because of her opposition to gender discrimination and she was denied re-employment in retaliation for her charge of gender discrimination, in violation of the MHRA; (3) she was subjected to malicious prosecution by Defendants when they initiated charges against her to try to force her to resign and then

---

[1]The case is before the undersigned United States Magistrate Judge by written consent of the parties. See 28 U.S.C. § 636(c).

[2]The members of the Board of Education named as defendants are Dana Rapier, Frank Blum, Jim Burns, Ralph Wilkerson, Annie Bass, Melanie Hopper, and Keith Stassner. In her memorandum in response to the pending motion, Plaintiff stated she was dismissing her claims against Hopper. The Court will order accordingly.

[3]Plaintiff's initial complaint included allegations that the non-renewal of her contract and the denial of re-employment also violated Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000(e) to 2000e(17). Plaintiff has since dismissed her Title VII claims.

withdrew those charges before the scheduled hearing; and (4) Defendants committed a prima facie tort because even if their actions were legal their motivation was improper and illegal. Also pending is Defendants' motion to strike Plaintiff's response to its Statement of Uncontroverted Facts and certain affidavits submitted by Plaintiff in support of her opposition to Defendants' dispositive motion.

## **Background**

At all times relevant, Plaintiff was employed by the Rolla 31 Public School District (the "District") as the principal of Mark Twain Elementary School ("Mark Twain"). (Stat. Uncontr'd Facts ¶¶ 6-7.[4]) Also employed by the District was Dennis Cook, Pat Johnson, and Amy Jones. (Id. ¶¶ 18-19, 73.) Cook was the District's Maintenance Director; Johnson was the Director of Transportation; and Jones was Cook's and Johnson's secretary. (Id. ¶¶ 62, 73, 80; Johnson Dep. at 7; Cook Dep. at 8.) Cook, Johnson, and Jones worked in the "bus barn," approximately one-half mile from Mark Twain. (Johnson Dep. at 114.)

This action has its genesis in the relationships between Plaintiff, Cook, Jones, and Johnson. A chronological recitation of their dealings with each other and with District administrators is essential to an understanding of Plaintiff's instant claims and their resolution.

Plaintiff and Cook began an affair in January 2002. (Stat. Uncontr'd Facts ¶ 32.) Prior to that, Plaintiff had used the school computer to send several suggestive e-mails to

---

[4]"Stat. Uncontr'd Facts" refers to Defendants' Statement of Uncontroverted Facts that are admitted or not disputed by Plaintiff.

Cook[5] and had been informed by the then assistant superintendent, Dr. Leonard Westbrook, that another employee had suggested that she and Cook were in an inappropriate relationship. (Reed Dep. at 69, 252-56.)  He told her to "be careful, people might get the wrong idea or words to that effect."  (Id. at 73.)  Plaintiff did not think that the employee's complaint was taken seriously.  (Id. at 71.)  It was after this that she and Cook began their affair.  (Id. at 72.)  During the affair, Plaintiff frequently called Cook on his cell phone, both for work and personal business.  (Id. at 134.)  The affair was ended by Cook in July 2002.  (Id. at 74, 290-91; Stat. Uncontr'd Facts ¶¶ 59, 60.)  At the time of the affair, Plaintiff was married to, but separated from, Kevin Schwalje.  (Reed Dep. at 26-27; Schwalje Aff. ¶ 2.)  Cook was also married.  (Cook Dep. at 122.)

After the end of the affair, Plaintiff wrote on July 17 to Cook that she would like to have a chance "at being special to [him] without all the complications" if he ever found himself single.  (Reed Dep. at 276.)  She was trying to honor his request to "[g]ive him some space" without losing a friend.  (Id. at 277.)  She wanted to maintain their friendship and, if at some point there was the chance of a "different kind of relationship," she was open to that. (Id. at 291.)  After Cook and his wife separated, Cook asked Plaintiff not to call him as frequently.  (Id. at 339.)

---

[5]For example, in one e-mail, Plaintiff wrote "lucky tile."  She explained this reference: "Because he made a comment once, when I asked what he was doing, he said laying tile.  I said lucky tile.  That was a joke."  (Reed Dep. at 256.)

Plaintiff spoke to Dr. Aaron Zalis several times in September about her concern for Cook. (Reed Dep. at 278.) She thought Cook was becoming more and more irrational and erratic.[6] (Id.)

Plaintiff and Cook had what Plaintiff describes as a "confrontation" on September 25 and again on October 4. (Reed Dep. at 322.)

In the morning on October 4, Plaintiff told Zalis that she could not do anything else to help Cook and that Zalis needed to do something. (Id. at 324.) She also told him she "had some concerns about [Cook's] mental state as . . . Cook had threatened to commit suicide." (Reed Aff. ¶ 15.) Zalis was then the assistant superintendent, having assumed the position in the 2002/03 school year. (Zalis Dep. I at 9-11.) His duties included human resources and the supervision of support services, including transportation and maintenance. (Id. at 10.)

Zalis testified in his deposition that Plaintiff told him in their October 4 conversation that she was concerned about Cook. (Id. at 26.) She appeared to be upset. (Id. at 24, 26.) He asked Plaintiff if she and Cook had more than a friendship. (Id. at 24.) Plaintiff replied that they had not. (Id.) Plaintiff did tell him that she wanted to back out of that friendship. (Reed Aff. ¶ 15.) Zalis and Plaintiff also spoke about Plaintiff's calls to Cook's cell phone. (Zalis Dep. II at 97-98.) Plaintiff informed Zalis that she would stop calling Cook's cell phone. (Id. at 43, 151.) Cook, however, complained to Zalis that he was continuing to get "too many" phone calls from Plaintiff, "[p]articularly after [being] fired."[7] (Id. at 151.)

---

[6]On the other hand, Cook spoke with Zalis one Friday evening about one month before he resigned about his problems with Plaintiff. (Cook Dep. at 67.)

[7]As noted later, Cook resigned in November.

Plaintiff took personal leave on two days, October 7 and 8, to "clear [her] head" about the Cook situation. (Reed Dep. at 62-63.) She disputes, however, that she informed Zalis of the reason for the leave. (Id. at 63-64.) Cook came to Plaintiff's office the day she returned from personal leave. (Mumma Dep. at 26-27.) His appearance disturbed her secretary, Charlene Mumma, because she thought their relationship was going to be restricted to work-related items. (Id. at 27-28.)

On November 2, Plaintiff successfully completed a supervisory test on preventing sexual harassment. (Defs. Ex. Q.) This interactive computer program defined sexual harassment as a behavior and cautioned that adults are responsible for their own behavior and its consequences. (Defs. Ex. P at 15.) A hostile work environment was defined as "one in which unwelcome conduct of a sexual nature creates an uncomfortable work environment for some members of the community[,]" including conduct that is "sexually explicit talk, sexually provocative photographs, foul or hostile language or inappropriate touching." (Id. at 32.) One pre-test question asked whether an employee's foul and obscene language could be interpreted as sexually harassing if it was not addressed to her co-workers. (Id. at 18.) Another pre-test question asked whether a student's persistent requests for a date with another student could be considered sexual harassment. (Id. at 19.) And, a third question asked whether off-color jokes during team meetings could be interpreted as sexually harassing if the jokes were "all in fun." (Id. at 20.) "What is harmless joking to one person may be grossly offensive to another." (Id. at 42.) The program further cautioned that intent was not relevant, but impact was. (Id. at 48.) Also, it was noted that "[m]ost workplace sexual harassment is based on power and not on romance." (Id. at 64.) Three problems were

possible consequences of an office romance, including the problem that would arise if the romance went sour. (Id. at 66.) Additionally, persons offended by a hostile work environment need not be the direct participants or targets of such environment. (Id. at 71.) It was further noted that retaliation against an employee who has complained about harassment or participated in an investigation into harassment is illegal and could lead to serious consequences. (Id. at 74.) The consequences of harassment or retaliation for supervisors was particularly serious. (Id. at 79.) One section of the program addressed humor and cautioned that "it [was] easy to harass someone accidentally through ill-considered attempts at humor, teasing or sarcasm." (Id. at 84.)

On November 13, Plaintiff learned that Cook had been confronted by Donna Shults, a District secretary, and Amy Jones about seeing them both at the same time. (Reed Dep. at 250, 353.) At a meeting orchestrated by another woman, Stacy Miller, Plaintiff and Shults had found out that Cook had a relationship with Plaintiff, Jones, and Shults. (Shults-Murphy Dep. at 36-37.) At one point – Shults could not recall if it was during this meeting – Shults told Plaintiff that Cook and Jones were calling her (Plaintiff) a stalker. (Id. at 100-01.) Plaintiff understood from Shults that Cook's and Jones' affair had started in May 2002 and was ongoing. (Reed Dep. at 354.) Plaintiff did not report this affair to the administration because she thought they already knew. (Id. at 296.)

Approximately the same day, November 13, Cook and Jones went to Zalis' office to tell him that there were rumors of a relationship between them. (Zalis Dep. I at 39, 41; Zalis Dep. II at 7.) Pat Johnson had told Zalis in August that she had a feeling that there was something between them. (Id. at 42.) Shults also informed Zalis and Dr. Terry Adams, the

superintendent,[8] of a relationship between the two when Zalis was later inquiring about a relationship between Cook and Plaintiff. (Zalis Dep. II at 6-7, 10-12.) Shults further informed Zalis that she and Cook were dating. (Id. at 11-12.)

The night of November 13, Plaintiff and Cook spoke over the telephone for a few hours and then met for a few hours. (Reed Dep. at 294.) He conveyed the impression that Jones was trying to make him think that Plaintiff was pursuing him. (Id. at 293.) She was not pursuing him; she was simply trying to maintain their friendship and was worried about him. (Id. at 300.) Cook also reported several things that Johnson and Jones were saying about her. (Id. at 295.)

Consequently, Plaintiff e-mailed Johnson and Jones the next day, November 14. (Id.) Johnson took a printed copy of the e-mail to Adams that same day. (Johnson Dep. at 78.) Adams avers that she told him she considered the e-mail inappropriate[9] and "wanted such

_____

[8]Adams became superintendent on July 1, 2002. (Stat. Uncontr'd Facts ¶ 11.)

[9]The e-mail reads as follows:
Amy and Pat,
It has come to my attention that both of you have made comments regarding me hanging up on you when you pick up Dennis' phone. First of all, if I call Dennis, I need to talk to Dennis. If I wanted to leave a message with either of you, I would call you. Second, Amy, I e-mailed you a question the other day after I was cut off twice, once calling your extension, once calling 458-0125. This is obviously a minor deal, and you can pick up the phone whenever you want, but it follows numerous comments made by the two of you in and out of your office that have gotten back to me. I am asking you as nicely as possible to get your issues with Dennis resolved and quit making disparaging comments about me to anyone. Your personal lives are your business, but once you involve my integrity at work, it's my business. I have defended both of you on more than one occasion – Amy on your reported affair with Dennis – and Pat, on the allegation made at a meeting that you were "running around spreading rumors[.]" In fact, one of my first contacts with my new boss was an e-mail defending you[.] I'm not interested in any conversations about this or any explanation. I will continue to treat you both with the amount of professional courtesy required.

conduct to stop." (Adams Aff. ¶ 8; Stat. Uncontr'd Facts ¶ 85.) Johnson testified in her deposition that Plaintiff telephoned her at home that evening. (Johnson Dep. at 125.) She felt threatened after their telephone conversation, and told Zalis so.[10] (Id. 126.) Plaintiff attempted to call Johnson back, and left her a voice message. (Id. at 125.)

Plaintiff met with Zalis three times in November, on the 14th, the 19th, and the 21st. (Reed Dep. at 117.) The last two meetings were also with Adams. (Id. at 117-18; Stat. Uncontr'd Facts ¶ 11.)

Zalis testified that in November he was given a list of names of people that he should contact when investigating Plaintiff's behavior. (Zalis Dep. I at 70.) At the November 14 meeting with Plaintiff, he instructed her not to contact the people herself. (Id. at 70, 73; Zalis Dep. II at 145.) Several of those people told him that Plaintiff had already informed them that Zalis would be contacting them. (Zalis Dep. I at 75-77.) These same people also told him that Plaintiff said nothing that interfered with his investigation. (Id.) Additionally, Johnson told Zalis that Plaintiff had called Cook and described Zalis' conversation with her about not contacting people as "an ass chewing."[11] (Id. at 70-71.) Cook also reported this telephone call to Zalis. (Cook Dep. at 71.)

Additionally, Johnson informed Zalis after his November 14 meeting with Plaintiff that she had received a telephone call from Plaintiff telling Johnson to "keep out of it" and not to tell people that she (Plaintiff) had called. (Zalis Dep. II at 145.) Plaintiff denies using

---

(Def. Ex. W.)

[10]Adams had asked Johnson to tell Zalis about her complaint. (Stat. Uncontr'd Facts ¶ 86.)

[11]Johnson had apparently been in the room when Plaintiff called Cook. (Zalis Dep. I at 71.)

that phrase or telling Johnson "to watch herself because 'it won't be pretty.'" (Reed Aff. ¶ 31.) Her reason for calling Johnson was to warn her that Cook was "acting irrationally . . . and, for her own protection, she needed to avoid being involved in matters concerning him." (Id. ¶ 30.) She also apologized for the statements in her e-mail about Johnson making comments about her. (Reed Dep. at 317-18.) Plaintiff had then concluded that Cook was playing people against each other. (Id. at 318.) Johnson told her, among other things, that she did not approve of what Plaintiff and Cook were doing. (Id. at 320.)

Zalis testified in his deposition that Johnson was uncomfortable with the telephone calls she had received at home from Plaintiff. (Zalis Dep. I at 65.)

On November 15, Cook came to Zalis' office with a tape recording Cook described as of a conversation he had had with Plaintiff asking her to leave him alone. (Zalis Dep. I at 42.) Zalis listened to a portion of the tape, including a statement by Plaintiff asking why the relationship could not continue and a reply by Cook that they needed to "keep [the] relationship work," and concluded that Plaintiff was sexually harassing Cook. (Id. at 53, 58; Zalis Dep. II at 29, 31; Cook Dep. II at 5.) Cook told Zalis that Plaintiff kept trying to have a conversation with him and interfering with him trying to do his job. (Zalis Dep. I at 41.) Cook refused to leave the recording with Zalis. (Id. at 40.) He also informed Zalis that he was not asking Zalis to do anything but simply wanted him to be aware of the situation. (Zalis Dep. II at 32.) Based on the tape recording and Cook's statements, Zalis concluded "that there was a relationship that one part of that was consensual, that one party wanted it to end, and [he] had evidence to show that one party didn't want it to end." (Zalis Dep. I at 54.) Zalis further explained that he did not care about whether the relationship between

Plaintiff and Cook had been consensual, but he did care whether one wanted it to end and whether it was in the workplace.  (Id. at 55.)  In short, there was unwelcome behavior and that behavior "interfere[d] with one or both's ability to do their job."  (Id. at 56-57.)

Also on November 15, Zalis was given a birthday card for a District bus mechanic, Robert Benchic, that Johnson had seen the day before on a counter in the lobby of the bus barn. (Johnson Dep. at 72.)  She read the card, and thought it was improper for work.  (Id. at 72-73.)  She wrote on a note, "On her own time and his own time I do not have a problem with it," and personally delivered the note and the card to Zalis.  (Id. at 73-75.)

The card had been created by Plaintiff and Mumma, during their lunch hour and using a District computer, for the October 29 birthday of Benchic.[12]  (Reed Dep. at 135-36; Benchic Dep. at 8, 9; Mumma Dep. at 7, 9, 20, 55.)  Mumma recalled the idea for the card as being Plaintiff's.  (Id. at 55.)  Benchic had mentioned that he looked at personal ads, and

---

[12]The birthday card had a photograph of Plaintiff and Mumma with pencils in their teeth and text that read as follows:

> Very attractive ex-supermodels, multiple weight classes and breast sizes.
> MDMDSSM Office Staff looking to enjoy life relationship with SDWYMM [single, divorced, white young male mechanic]
> Must be prepared to use tools well.  Must be good with his hands.  Must be willing to take on all three at once
> Good with children a must – 7 between the three of us
> Willing to relocate
> Favorite activities include spending men's money, fishing for money, gambling with money and oh yeah, camping and all that outdoorsy guy crap.
>
> Interested applicants call 1-800-ELEM-BABES
>
> HAPPY BIRTHDAY!!

(Def. Ex. M; Mumma Dep. at 51, 53.)

the card was meant to be a spoof of such ads. (Id. at 19-20.) The card was delivered to the transportation department by an off-duty employee who was on her way home. (Reed Dep. at 136; Benchic Dep. at 10; Mumma Dep. at 52.) When questioned about the birthday card during her deposition, Mumma acknowledged that, on rereading, the card clearly had sexual overtones. (Mumma Dep. at 52.) She did not, however, intend that anyone be offended by it or that it embarrass Benchic. (Id. at 52-53.) She was reprimanded by Adams and Zalis for sending the card. (Id. at 53.) Plaintiff was not sure if she had exercised poor judgment by sending the card. (Reed Dep. at 332.) Benchic was not offended by the card and thought it was a joke without any sexual innuendo. (Benchic Dep. at 9, 20.) In hindsight, he thought it was an inappropriate card for a principal to send an employee. (Id. at 20-21.)

Five days after her telephone call to Johnson, on November 19, Plaintiff sent Zalis an e-mail, forwarded from her home computer, explaining that she had telephoned Johnson to apologize and reporting that Johnson "pretty much lost it with [Plaintiff]." (Def. Ex. Z.) Plaintiff also apologized to Zalis that he had to spend his time dealing with the situation, took "full responsibility for some pretty heated confrontations back in September/early Oct.", and explained that she was "very uncomfortable" with "this person" having access to her office. (Id.)

As noted above, Plaintiff met with Zalis and Adams on the 19th. When asked by Zalis if there was anything between Plaintiff and Cook more than a friendship, Plaintiff "very carefully" and truthfully said there was not. (Reed Dep. at 65, 118; Zalis Dep. II at 85; Adams Dep. at 75; Stat. Uncontr'd Facts ¶ 66.) At the time, there was nothing else going on.

(Reed Dep. at 65.)  At the third meeting, Plaintiff did disclose to Adams and Zalis that she had had a sexual relationship with Cook.  (Id. at 111, 118.)

Also at the November 19 meeting, Plaintiff was asked about her cell phone use and her use of e-mails.  (Zalis Dep. II at 42-44.)  A number of the cell phone calls were to Cook's cell phone.  (Id. at 43, 97-98.)  Johnson and Cook had reported to Adams that Plaintiff had made 42 calls to Cook's cell phone one morning.  (Adams Dep. at 76.)  Adams did not independently verify this.  (Id.)  When asked about the e-mails, Zalis replied as follows:

> I know that e-mails were being sent during school time for issues related to the relationship.  Rumors, things that were causing her noticeable emotional problems.  They had nothing to do with the instruction of students at school.
>
> You were asking me if I knew they were excessive.  I didn't dive into that.  I didn't get that far within the two-week period.

(Zalis Dep. II at 45-46.)

Also discussed at one of the meetings was the birthday card that Plaintiff had sent Robert Benchic.  (Zalis Dep. II at 47.)

On November 20, Cook made a formal complaint that Plaintiff was sexually harassing him.  (Zalis Dep. I at 59.)  The written complaint reads as follows:

To Whom It May Concern:

It is not my intent to cause any trouble for any one.  But, I have recently had numerous rumors spread about me concerning co-workers.  I believe this is mainly due to jealousy.

If my job becomes in jeopardy, I fully intend to protect myself from slanderous rumors.  I will ask for facts of these rumors, other than hearsay.

I have felt for some time now that another school employee has sexually harassed me.  I have proof of this harassment by means of tape recordings and

documents. I had hoped that this harassment would end, but it does not seem like that is going to happen.

I am willing to drop the harassment issue if it stops, but if it does not I will pursue all necessary avenues to end it.

Numerous people who have witnessed this harassment can prove my statements to be true.

(Def. Ex. PP.)

Plaintiff, Zalis, and Adams met on November 21. Among other things, the subject of Plaintiff's telephone call to Johnson was discussed. (Adams Dep. at 43.) Adams repeated Zalis' earlier directive to Plaintiff to stay out of the investigation. (<u>Id.</u>) Adams had not yet come to the conclusion that Plaintiff's employment with the District should be terminated. (<u>Id.</u> at 65.)

When asked by Adams and Zalis about Plaintiff and Cook, Mumma told them that the two had a "hot-and-cold, off-and-on type of friendly relationship." (Mumma Dep. at 74.) She also told them that Plaintiff would be a better principal after her friendship with Cook was over. (<u>Id.</u> at 75; Adams Dep. at 31.) She thought she might have told the two men that, at that point in time, the feelings of Plaintiff for Cook were stronger than his for her. (Mumma Dep. at 75-76.) She further told them that Plaintiff was fulfilling her duties as a principal. (<u>Id.</u> at 81.)

Cook resigned on November 21. (Zalis Dep. II at 49, 110.) When turning in his resignation, he gave Zalis a tape recording that he identified as being the same he played for him on November 15. (Zalis Dep. I at 63.) Zalis did not listen to the tape. (<u>Id.</u> at 63-64.)

That same day, Plaintiff e-mailed Zalis at 8:57 in the morning to suggest that he speak with her two secretaries and her head custodian if Zalis was going to question people about whether she had sexually harassed Cook.[13] (Reed Dep. at 329.) The e-mail made it apparent to Zalis that Plaintiff had contacted employees after being instructed not to. (Zalis Dep. II at 146-47.)

The next day, Plaintiff was given a letter signed by Adams placing her on administrative leave with pay. (Def. Ex. DD.) This letter reads, in relevant part, as follows:

> As you are aware, the administration has received reports that you have engaged in inappropriate and unprofessional conduct toward several employees of the [District]. These reports have been discussed with you, and you have been permitted to provide your explanation of the events.

---

[13]This e-mail reads as follows:

If you are questioning others about any perception on their parts that I have "sexually harassed" Dennis Cook in any way, I think it would be helpful for you to talk to both by secretaries [Mumma and Delinda Gillardi], and even Mark Jones, my head custodian, all of whom can attest to the fact that Dennis' presence here and behavior (during the months of September/October) did not indicate that he felt at all harassed by me.

Since apparently phone logs were considered in establishing that I called him last week, I would be happy to provide, when able, my own phone records, indicating that he called me last week both at home and on my cell phone.

Perhaps none of this is necessary, but I am really struggling with the fact that individuals can blatantly lie and attack my personally [sic] integrity and then they both say they can work with me just fine. I am the one who was attacked. Yes, I will continue to do my job well and wok with their departments, but I would like to keep the majority of correspondence with Dennis and Pat in written form. Their ability to cause me to suffer the humiliation and professional damage I feel has occurred is based primarily on their distorting conversations/phone conversations and/or blatantly lying about them. . . .

Again, I want to reiterate that I am in no way trying to get out of taking responsibility for my poor judgment. I am simply suggesting you hear from appropriate individuals who know that I was not sexually harassing [sic] him, and I would like to protect myself from future attacks from Dennis and/or Pat.

(Def. Ex. CC.)

During the discussions regarding this matter, you have provided statements and admissions that demonstrate that you have engaged in behavior that constitutes immoral conduct as defined by the school laws of this state. Such conduct includes a sexual relationship with another District employee, which relationship directly interfered with your ability to effectively perform your duties as a building principal. Additionally, as a direct result of this relationship, you engaged in conduct that could reasonably be construed as retaliation toward employees who had reported their concerns regarding your behavior. Furthermore, although you were directed by the administration not to have any further contact with persons whom you knew or believed to have expressed such concerns, you continued to communicate with them regarding the subject matter of their reports. Your failure to comply with the administrative directives was insubordinate, as well as constituting further incidents of retaliation.

Moreover, you engaged in conduct that was reported and could reasonably be construed as sexual harassment. This conduct included reports that you had continued to pursue another employee of the District with whom you had engaged in a sexual relationship, despite his requests that the conduct end, and a verified report that you had created and sent a sexually suggestive birthday card to another employee of the District, for whom you have at least partial supervisory responsibility. . . . Moreover, you engaged in such conduct despite numerous conferences with you during your employment regarding rumors and concerns regarding your behavior, and the detrimental effect of such rumors and concerns on your ability to perform your duties.

(Id.)

Zalis concurred in the recommendation to terminate Plaintiff's employment, having concluded that her sexual relationship with Cook had interfered with her ability to perform at least one of her duties as building principal,[14] specifically, the area of professional

---

[14]As a building principal, Plaintiff was charged by Board policy "with the supervision and direction of the staff and students assigned to the building, as well as with the care of the school facility and its equipment. The principal or director will ensure that the Board policies, rules, and regulations, as well as the directives of the superintendent and the guidelines for the instructional program are observed." (Adams Aff. Ex. 4.) One Board policy prohibited "unwelcome sexual advances, unwelcome requests for sexual favors and other unwelcome verbal, nonverbal or physical conduct of a sexual nature[.]" (Adams Aff. Ex. 1 at 4.)

relationships and responsibilities. (Zalis Dep. I at 36-37.) In that area, a principal had "to be able to work with all people internally, including directors of maintenance and transportation, in order to run an effective school." (Id. at 37.) Consequently, a principal could not define who he or she would or would not work with. (Id. at 38.) Zalis found fault in Plaintiff's relationships with the director of maintenance, Cook, and the director of transportation, Johnson. (Id. at 39, 64-65.) He also concluded that Plaintiff was sexual harassing Cook. (Id. at 89.)

Plaintiff was given until the close of business four days later by which to submit to her resignation. (Id.) Failure to do so would result in a statement of charges being issued. (Id.)

After Plaintiff was placed on administrative leave, Michael Barnes, an HVAC technician with the District, complained that the previous summer Plaintiff had grabbed his buttocks from behind when he was bent over. (Barnes Dep. at 7, 9, 12.) The physical contact was very brief. (Id. at 13.) When Barnes turned around to see who had grabbed him, he saw Plaintiff. (Id.) She was laughing. (Id. at 13, 15, 34.) Although he was embarrassed and offended, he did not then complain to his supervisor, Cook. (Id. at 15, 38.) He did, on his own initiative, give a handwritten statement about the incident to Cook within a day or two of Cook resigning.[15] (Id. at 18-19.) Barnes further testified that he felt like he could complain after Plaintiff had been placed on administrative leave because he then thought that something might be done about the incident. (Id. at 37, 40.) And, although he had seen Plaintiff in Cook's office, he had never seen her grab or touch Cook. (Id. at 43.) He had

---

[15]This statement is marked received on December 4, 2002. (Def. Ex. U.)

heard Plaintiff and Cook talk on the telephone "many times." (Id. at 44.) He had also seen Cook refuse to pick up the telephone when Plaintiff was calling, seen Cook hang up the telephone when Plaintiff was calling only to have Plaintiff call right back, and heard Cook comment that he was tired of Plaintiff calling. (Id. at 44-45, 47.) Barnes further testified that he had not finished a job at Mark Twain once because he saw Plaintiff's car in the parking lot. (Id. at 49.)

Plaintiff denies ever grabbing Barnes' buttocks or touching him in an inappropriate or offensive manner. (Reed Aff. ¶¶ 6, 8-9.)

Plaintiff did not submit her resignation; consequently, a Statement of Charges[16] was authorized and signed by Adams, without a vote by the Board. (Adams Aff. ¶¶ 25, 26.) A hearing was to be held before the Board on the Statement on February 6 and 7, 2003. (Pl. Ex. 21.)

In January 2003, the Board of Education, based on Adams' recommendation, decided not to renew Plaintiff's contract. (Adams Dep. at 15.) Consequently, the scheduled hearing before the Board was cancelled. (Pl. Ex. 21.)

Adams testified in his deposition that he made this recommendation because of "[p]erformance issues that related to immoral conduct relative to [Plaintiff's] relationship to

---

[16]The Statement of Charges included allegations of (a) immoral conduct, i.e., (i) engaging in sexual relations with another District employee while each was married to another and the detrimental effect of those relations on her performance as a principal and (ii) engaging in inappropriate sexual conduct toward a subordinate employee, Barnes, while acting in her capacity as a principal; (b) willful and persistent violation of, and failure to follow, Board policies and regulations, i.e., the Board policy on nondiscrimination and anti-harassment; (c) willful and persistent violation of, and failure to follow, Missouri school laws, i.e., the same behavior that violated Board policies and regulations; (d) insubordination, i.e., engaging in the same behavior cited above; and (e) breach of contract based on that same behavior. (Def. Ex. GG.)

Dennis Cook, and retaliation against Miss Johnson for her communications with the District relative to our discussions about what had gone on between [Cook and Plaintiff]." (Adams Dep. at 15.) He contended that the relationship between the two had an adverse impact on Plaintiff's ability to do her job. (Id.) For instance, Plaintiff was reportedly at the maintenance building two or three times a week – an excessive number of times. (Id. at 17.) Several employees talked about the amount of time that was spent on the relationship between Cook and Plaintiff. (Id. at 31.)

Adams also avers that he made the recommendation after determining that "the pre-hearing discovery proceedings and the termination hearing would be more costly than permitting [Plaintiff] to remain in the District's employ and non-renewing her contract effective at the end of the 2002-2003 school year." (Adams Aff. ¶ 30.) Plaintiff, on the other hand, avers that she "received information that it would only cost the District $6,800.00 to get backup tapes regarding emails [sic] which were requested by my attorneys in discovery prior to the scheduled hearing on the Statement of Charges." (Reed Aff. ¶ 51.) She also questions the $6,800.00 figure based on the District's representations that they regularly make back-up tapes. (Id.)

Plaintiff was later offered an opportunity to respond to the allegations in the Statement of Charges but chose not to accept. (Adams Dep. at 158.) She was paid her full annual salary of $68,000.00 for the 2002/03 school year. (Reed Dep. at 42, 102.)

Plaintiff contends that men in similar situations have not suffered similar consequences, specifically Nick Ginos, Bob Chapman, Ted Arthur, and Floyd Baker. (Reed Dep. at 43.)

Plaintiff testified in her deposition that Ginos' wife, Jeannie Cavender, told her in 1998 or 1999 that he had had an extramarital affair. (<u>Id.</u> at 43, 46.) Ms. Cavender told her this after the affair had ended and the couple was divorced. (<u>Id.</u> at 46-47.) Plaintiff did not know if any member of the Board of Education was aware of the affair when it occurred, but did opine that "[e]veryone" knew of it. (<u>Id.</u> at 44.) She did not know if anyone complained of the affair. (<u>Id.</u>) She did not know if anyone filed a sexual harassment complaint against Ginos. (<u>Id.</u>) She did not know if he was ever accused of "grabb[ing] the butt of another employee." (<u>Id.</u> at 45.) She did not know if he had been directed not to interfere with an investigation of a sexual harassment complaint against him or directed to stay away from anyone who had complained about his behavior. (<u>Id.</u> at 52.) Nor did she know if he ever used District time and employees to prepare and send a sexually suggestive birthday card to another employee or if he used District time and materials to further a sexual relationship with an employee who no longer wished to have such a relationship. (<u>Id.</u> at 45.)

Plaintiff further testified that Robert Chapman had had an affair with a subordinate, probably during the 2001/02 school year. (<u>Id.</u> at 48.) Several people told her this. (<u>Id.</u>) Plaintiff did not know if anybody filed a charge of discrimination against him, if anyone told the administration of the affair, if he sent sexually inappropriate birthday cards to employees during school time, of if he was directed not to interfere with an investigation of him and to stay away from anyone who had complained about him. (<u>Id.</u> at 48-49, 52.) The same people who had told her of Ginos' affair told her about Chapman's. (<u>Id.</u> at 49.)

Ted Arthur had, according to Plaintiff, an affair at least five years before with a married teacher when he was the assistant principal of the junior high school. (<u>Id.</u> at 52.)

Plaintiff was not employed by the District at the time and had no first-hand knowledge of the affair. (Id. at 53.) She also did not know if he was alleged to have been the subject of a sexual harassment complaint or to have used District time and resources to further the affair. (Id. at 54.) Floyd Baker allegedly had an affair with a subordinate, Melanie Wilkins, during the 2001/02 school year. (Id.) As with Ginos, Chapman, and Arthur, Plaintiff did not know if Baker had been the subject of a sexual harassment complaint. (Id. at 55.)

Plaintiff also testified that a teacher, Jeff Sanquest, had an affair with a married teacher when he was married. (Id. at 56.) This was probably in the 2000/01 school year. (Id.) She did not know if anyone filed a sexual harassment complaint against him or if anyone accused him of grabbing them against their will or of sending a sexually inappropriate card using District time and resources. (Id. at 56-57.)

Christopher Johnson, formerly employed as a teacher and then an assistant director at the Rolla Technical Institute (RTI), testified in his deposition that Baker had been involved with Wilkins, a District counselor. (Johnson Dep. at 10, 15-16.) This involvement was "fairly widely known through the entire [RTI] staff." (Id. at 16.) The superintendent at the time was Dr. Ewing and the assistant superintendent was Dr. Westbrook. (Id. at 17.) He had heard from two staff members, Max Bath and Tom Strain, that Baker had also had "inappropriate sexual relations with his secretary." (Id. at 18.) Johnson was told this after he had left RTI. (Id. at 36.) When working at RTI, Johnson simply had heard that the secretary was being given special treatment or privileges. (Id. at 95-96.) Johnson had "also heard people indicate that Chapman had a relationship at the time with one of the [RTI] staff members." (Id. at 17.) Johnson had, however, no first-hand knowledge of any of these

alleged relationships.  (Id. at 52, 78.)  Although he did have an impression from observing Baker and his secretary that they were involved, he never informed Adams or Zalis of this relationship because it was not reported to him until after he left following the 2002/03 school year.  (Id. at 56-57.)  He did not know whether Baker had ever filed a sexual harassment complaint against his secretary or vice versa or if Baker had ever filed a sexual harassment complaint against the counselor or vice versa.  (Id. at 57-58, 80.)  And, although he thought Baker might be retaliating against the counselor with whom he had previously been involved, e.g., Baker talked about getting the counselor fired or moved to a different building, Johnson never told Adams of Baker's actions.  (Id. at 59-60.)  Johnson explained this omission by stating that Baker had "channeled" his derogatory comments and feelings toward the counselor to Baker's immediate supervisor, Janice Martin.  (Id. at 60.)  He did not know if Martin had ever reported what Johnson described as "a very promiscuous kind of atmosphere" to Adams.  (Id. at 20, 142.)  Nor did Johnson report to Adams the allegations that Baker and the counselor had, at one point, been suspected of having a personal relationship or that Baker had made an inappropriate comment to the counselor.  (Id. at 76, 77, 103-04.)  Wilkins never complained to Johnson about Baker's actions.  (Id. at 61-62.)

As noted above, when at RTI, Johnson also heard reports that Chapman and another District employee were having a personal relationship.  (Id. at 82.)  He never reported these allegations to the superintendent, including Adams.  (Id. at 82-83.)  Indeed, he "never reported anything to . . . Adams."  (Id. at 110.)

Adams avers, without contradiction, that Drs. Ginos and Chapman were never under his supervision and Dr. Laub was not under his supervision when the complaint was made

against him.  (Adams Aff. ¶¶ 35-37.)  Additionally, he has never received a complaint of any alleged relationship between Mr. Noel and another District employee, nor was he ever aware of an inappropriate relationship between Floyd Baker and another District employee.  (Id. ¶ 39; Adams Aff. II ¶ 6.)

Of the five men named, Plaintiff did not know if any had sent messages to the person they were having an affair with during school hours.  (Reed Dep. at 59.)  Nor was she aware of any male employees who had admitted spending a lot of time in furtherance of a relationship with another employee of the District, who had grabbed another employee against his or her will, who had enlisted the assistance of other employees to prepare sexually inappropriate materials, or who had been instructed not to contact District employees regarding a pending investigation of his conduct.  (Id. at 66-67.)  Indeed, Plaintiff replied, "Correct," when asked: "So is it correct that for the four men whose names that you have given me, you really do not know whether they actually are similar to you in all respects or not?"  (Id.)  She did not think, however, that "similarly situated" meant that the cited employee had to be charged with doing "every single exact same thing" she was accused of doing.  (Id. at 78.)

When asked if there was anything else that supported her claim that she was treated differently than men employees, Plaintiff replied: "I think the preconceived notion that men can do what they want and women can't."  (Id. at 57.)  This has historically been the case; thus, Plaintiff contends that people engaged in alleged misconduct 15 or 20 years earlier are similarly situated to her.  (Id. at 58.)  Additionally, the five men named were in leadership positions and engaged in "immoral conduct."  (Id. at 59-60.)

When asked if she had any reason to believe she was entitled to a hearing after being non-renewed, Plaintiff replied that she was not so entitled. (Id. at 103.) The hearing that was originally scheduled was to determine whether or not her employment should be terminated before the end of the contract. (Id. at 126.) Plaintiff testified that she considers the District's proffered economic reasons of not holding the hearing to be false because they don't make sense. (Id. at 153.) And, although Plaintiff agreed that she used the District's cell and land-based telephones, its e-mail system, and its resources and time in furtherance of her relationship with Cook, she denied that this use was in violation of any Board policy. (Id. at 128-29.)

## Discussion

Rule 56(c) of the Federal Rules of Civil Procedure mandates the entry of summary judgment if all of the information before the court shows "there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." See **Celotex Corp. v. Catrett**, 477 U.S. 317, 322 (1986). An issue of material fact is genuine if it has a real basis in the record; and, a genuine issue of fact is material if it "might affect the outcome of the suit under the governing law." **Hartnagel v. Norman**, 953 F.2d 394, 395 (8th Cir. 1992) (citations omitted).

The initial burden is on the moving party to clearly establish the non-existence of any genuine issue of fact that is material to a judgment in its favor. See **City of Mt. Pleasant, Iowa v. Associated Elec. Co-op., Inc.**, 838 F.2d 268, 273 (8th Cir. 1988). After the moving party discharges this burden, the non-moving party must do more than show that there is some doubt as to the facts. See **Matsushita Elec. Indus. Co. v. Zenith Radio Corp.**, 475

U.S. 574, 586 (1986).  "A plaintiff facing a summary judgment motion cannot 'get to the jury without any significant probative evidence tending to support the complaint[,]'" but must "make a sufficient showing on every essential element of its claim on which it bears the burden of proof."  **Buettner v. Arch Coal Sales Co.**, 216 F.3d 707, 718 (8th Cir. 2000) (alteration added) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986)).  And, "in order to defeat a motion for summary judgment, the non-movant cannot simply create a factual dispute; rather, there must be a genuine dispute over those facts that could actually affect the outcome of the lawsuit."  **Webb v. Lawrence County**, 144 F.3d 1131, 1135 (8th Cir. 1998).  "Mere allegations not supported with specific facts are insufficient to establish a material issue of fact[.] "  **Henthorn v. Capitol Communications, Inc.**, 359 F.3d 1021, 1026 (8th Cir. 2004) (alteration added).  "Only admissible evidence may be used . . ., and affidavits must be based on personal knowledge."  **Id.** (alteration added) (interim citations omitted).  See also **Stanback v. Best Diversified Products, Inc.**, 180 F.3d 903, 909 (8th Cir. 1999) (finding general statements in affidavits and depositions are insufficient to defeat a properly supported summary judgment motion).  All disputed facts are to be resolved, however, and all inferences are to be drawn in favor of the non-moving party.  See **Ghane v. West**, 148 F.3d 979, 981 (8th Cir. 1998); **Kopp v. Samaritan Health Sys., Inc.**, 13 F.3d 264, 269 (8th Cir. 1993).

Summary judgment should seldom be granted in cases alleging employment discrimination.  See **Luciano v. Monfort, Inc.**, 259 F.3d 906, 908 (8th Cir. 2001); **Bradley v. Widnall**, 232 F.3d 626, 630-31 (8th Cir. 2000); **Keathley v. Ameritech Corp.**, 187 F.3d 915, 919 (8th Cir. 1999).  This is so "[b]ecause employment discrimination cases frequently

turn on inferences rather than direct evidence," **Bell v. Conopco, Inc.**, 186 F.3d 1099, 1011 (8th Cir. 1999) (alteration added), and are inherently fact based, **Keathley**, 187 F.3d at 919. Summary judgment is appropriate in employment discrimination cases, however, "where there are no disputed facts and only one conclusion is possible." **Woods v. Perry**, 375 F.3d 671, 674 (8th Cir. 2004). See also **Pope v. ESA Servs., Inc.**, 406 F.3d 1001, 1006 (8th Cir. 2005) ("[T]his Court also has noted that there is no discrimination exception to the application of Fed.R.Civ.P. 56, and it remains a useful pretrial tool to determine whether or not any case, including one alleging discrimination, merits a trial." (alteration added; interim quotations omitted)).

Count I: Gender Discrimination. Plaintiff first argues that her contract was not renewed because of her sex.

Plaintiff has not submitted any direct evidence of gender discrimination; consequently, "the familiar McDonnell Douglas burden-shifting analysis applies" to her claims.[17] **Schoffstall v. Henderson**, 223 F.3d 818, 824 (8th Cir. 2000). This analysis requires Plaintiff to "prove 1) that she is a member of a protected group; 2) that she was meeting the legitimate expectations of her employer; 3) that she suffered an adverse employment action; and 4) that circumstances exist which give rise to an inference of discrimination." **Wheeler v. Aventis Pharms.**, 360 F.3d 853, 857 (8th Cir. 2004). The proof of a prima facie case is satisfied by a "minimal evidentiary showing." **Pope**, 406 F.3d

---

[17]Although Plaintiff has dismissed her Title VII claims, her MHRA claims are analyzed under the same legal principles as would be her Title VII claims. See **Duncan v. General Motors Corp.**, 300 F.3d 928, 930 n.2 (8th Cir. 2002).

at 1007.  Moreover, "[t]he proof . . . is not inflexible and varies somewhat with the specific facts of each case."  **Id.** at 1008 (alterations added; interim quotations omitted).

"Upon establishing a prima facie case of discrimination, the burden of production shifts to the defendant to show that it had a legitimate, nondiscriminatory reason for its actions."  **Id.** at 1007.  "Once this burden has been met, the presumption of discrimination disappears, requiring the plaintiff to prove that the proffered justification is merely a pretext for discrimination.  At all times, the burden of persuasion remains with the plaintiff."  **Id.** (interim citations omitted).  "Merely disputing [the employer's] reason is insufficient, however.  [The plaintiff] must show both that the reason was false, and that discrimination was the real reason."  **Stuart v. General Motors Corp.**, 217 F.3d 621, 634 (8th Cir. 2000) (alterations added; interim quotations omitted).  Often "'the employer's proffered reason [for discharging the employee] is that the employee was not performing the job satisfactorily, which is simply the negative of one of the elements of the prima facie case.'"  **Cherry v. Ritenour School Dist.**, 361 F.3d 474, 479 (8th Cir. 2004) (quoting Erickson v. Farmland Indus., Inc., 271 F.3d 718, 726 (8th Cir. 2001)) (alteration added).  "[T]he presumptive case requires only a minimal showing, while a showing of pretext requires more substantial evidence."  **Id.** (alteration added) (citing Erickson, 271 F.3d at 726-27).  And, "[a]lthough it is possible for strong evidence of a prima facie case to also present a factual issue on pretext, the ultimate question is whether the plaintiff presents evidence of conduct or statements by persons involved in [the employer's] decision-making process reflective of a discriminatory attitude sufficient to allow a reasonable jury to infer that that attitude was a motivating factor in [the employer's] decision to fire [the plaintiff]."  **Kiel v. Select**

**Artificials, Inc.**, 169 F.3d 1131, 1135 (8th Cir. 1999) (en banc) (citations and quotations omitted) (first alteration added, others in original).  "The evidence supporting the plaintiff's prima facie case may suffice[, however,] to discredit the defendant's explanation, and the plaintiff is not required in all cases to introduce additional evidence to meet the burden of proof."  **Peterson v. Scott County**, 406 F.3d 515, 521 (8th Cir. 2005) (alteration added).

It is undisputed that Plaintiff is a member of a protected class and has suffered an adverse employment action.  Defendants argue that she was not qualified for the position, citing her evaluation for the 1998/99 school year.  (Defs. Ex. R.)  Plaintiff's performance in one of the eight areas of "Instructional Leadership" was found below expectations, as was her performance in one of the eight areas of "School Management."  (Id.)  There is no evidence, however, that these two areas continued to be a problem in the following three school years during which Plaintiff was employed as a principal.  Indeed, the evaluations for the next three years that Plaintiff worked as the principal at Mark Twain rated her performance as meeting or exceeding expectations.  (Pl. Ex. 23.)  Accordingly, for the purposes of the pending motion, the Court finds that Plaintiff has satisfied the third element of a prima facie case.

Plaintiff argues that several circumstances give rise to an inference that her gender was the true reason for the non-renewal of her contract: the quality of her performance as principal; the lack of merit to the sexual harassment complaint; the District's failure to terminate similarly situated male employees; and the historical viability of gender discrimination.

Because Defendants' proffered nondiscriminatory reason for the non-renewal of Plaintiff's contract is the negative of this element of the prima facie case and because a showing that this reason is pretextual requires substantial evidence rather than the minimal showing required for a prima facie case, the Court will assume, without deciding, that Plaintiff has also established the fourth element of a prima facie case and will address the issue whether Plaintiff has created a genuine issue of material fact that Defendants' nondiscriminatory reasons are pretextual.

As noted above, Plaintiff received good annual evaluation reports for the four years for which she served as principal of Mark Twain. The last three of those reports had no areas in which she did not at least meet the performance expectations. Although evidence of consistent favorable evaluations, promotions, and raises does "not alone create a genuine issue of fact regarding pretext and discrimination," it is nonetheless relevant when considered as part of the record as a whole. **Strate v. Midwest Bankcentre, Inc.**, 398 F.3d 1011, 1020 (8th Cir. 2005). The relevancy in the instant case of Plaintiff's evaluations is undermined by the timing of the claims against her. Her affair with Cook ended the summer following the 2001/02 school year, the last year for which she was formally evaluated. The controversy about that affair and its aftermath did not arise until the 2002/03 school year. It is the aftermath and Plaintiff's behavior toward Cook and Johnson that Defendants cite as the reason for her non-renewal. Her good evaluation reports for the prior years do not refute this reason.

Plaintiff also argues the merits of Cook's and Johnson's complaints against her. For instance, she argues that she did not call Cook as often as alleged and did not say to Johnson

the words alleged. These arguments do not, however, support an inference of discrimination. See **Cronquist v. City of Minneapolis**, 237 F.3d 920, 927 (8th Cir. 2001) (rejecting plaintiff's challenges to merits of the harassment claims against her that were cited by defendant as the reason for her termination). Moreover, she has "not presented any evidence that the investigation or investigators [Adams or Zalis] were biased or discriminated against [her]." **Id.** at 928 (alterations added). Plaintiff has produced no evidence showing that Adams or Zalis did not believe that she was pursuing Cook as he alleged or that she was calling Johnson as Johnson alleged. Zalis had had prior conversations with Plaintiff about Cook and could clearly come to his own conclusion about why she was so concerned about Cook's mental state. Adams and Zalis also had the birthday card, an e-mail from Plaintiff to Johnson and Jones restricting their future communications to writing, Cook's and Johnson's report of 42 telephone calls one morning from Plaintiff to Cook, and Johnson's reactions to communications she alleged were from Plaintiff. The issue is not whether the proffered reasons for the non-renewal of Plaintiff's contract are correct. See **Pope**, 406 F.3d at 1008. Accord **Dorsey v. Pinnacle Automation Co.**, 278 F.3d 830, 837 (8th Cir. 2002). Rather, "the issue is whether [the District] conducted a thorough investigation" of the precipitating charges against Plaintiff and "whether it made credibility determinations reasonably and in good faith." **Pope**, 406 F.3d at 1008 (alteration added). Plaintiff has produced no evidence that the credibility determinations of Adams and Zalis were not made in good faith. See **Id.** at 1009 (affirming grant of summary judgment to employer after plaintiff failed to show that the employer had not relied in good faith on the allegations against the plaintiff). See also **Griffith v. City of Des Moines**, 387 F.3d 733, 738 (8th Cir.

2004) (affirming grant of summary judgment in discrimination claim by employee on grounds that it was undisputed that he had exhibited anger and disrespect to a supervisor and that there was no evidence that supervisor did not believe employee was guilty of misconduct); **Dhyne v. Meiners Thriftway, Inc.**, 184 F.3d 983, 989 (8th Cir. 1999) (finding that discharged employee's denial that she violated company's rules against eating food without paying for it was not, standing alone, evidence that employer fabricated the charge); **Stevens v. St. Louis Univ. Med. Ctr**, 97 F.3d 268, 272 (8th Cir. 1996) (affirming grant of summary judgment in discrimination case filed by employee who introduced evidence that the two incidents cited by employer as reason for her termination did not occur as employer described and who disagreed that the two incidents warranted her dismissal). Additionally, after Plaintiff was placed on administrative leave and before the recommendation was made to not renew her contract, Adams and Zalis were presented with Barnes' statement alleging that Plaintiff had grabbed his buttocks without his consent. Cf. **Peterson**, 406 F.3d at 523 (rejecting employer's reliance on complaint about plaintiff's job-related behavior on the grounds that complaint was made *after* adverse employment decision had been made); **EEOC v. Kohler, Inc.**, 335 F.3d 766, 774-75 (8th Cir. 2003) (finding that decision to recommend terminating employee for time card fraud prior to reviewing that employee's or any other employee's time cards or conducting any other investigation implied improper retaliatory motive).

Plaintiff's protestation that gender discrimination is historical does not rise to the level of evidence; hence, it does not refute Defendants' nondiscriminatory reasons for their action.

Plaintiff also argues that evidence of pretext is established by Defendants' failure to treat similarly situated male employees the same.

"A plaintiff may demonstrate pretext by showing that [s]he was treated less favorably than similarly-situated employees outside of [her] protected group." **Pope**, 406 F.3d at 1009 (alterations added). "The test for determining whether employees are similarly situated is a rigorous one." **Id.** "'For discriminatory discipline claims, employees are similarly situated only when they are involved in or accused of the same offense and are disciplined in different ways.'" **Id.** (quoting <u>Wheeler</u>, 360 F.3d at 858). <u>See also</u> **Harvey v. Anheuser-Busch, Inc.**, 38 F.3d 968, 972-73 (8th Cir. 1994) ("To be probative evidence of pretext, the misconduct of more leniently disciplined employees must be of comparable seriousness." (interim quotations omitted)). "Further, the plaintiff must show that [s]he and those employees outside of [her] protected group were similarly situated in all relevant respects." **Id.** (alterations added). <u>Accord</u> **Britton v. City of Poplar Bluff, Mo.**, 244 F.3d 994, 998 (8th Cir. 2001).

The men Plaintiff names as being similarly situated are not. First, Plaintiff improperly relies on hearsay to support her allegations that the named men engaged in extramarital affairs when employed by the District. As noted above, hearsay is not admissible in summary judgment proceedings. Second, Plaintiff has failed to establish that any of these men were similarly situated because (a) they were not supervised by Adams or Zalis when allegedly engaging in the extramarital affairs; (b) there is no evidence that the women with whom they had the affair later made a sexual harassment complaint against them; (c) there is no evidence that anyone else in the District complained to either Adams or Zalis about

men's alleged inappropriate behavior; and (d) there is no evidence that any sexual harassment complaint against them was followed by a complaint by another employee of unwelcome touching. Nor is there any allegation that the men engaged in the alleged improper behavior shortly after completing an interactive program on sexual harassment cautioning them about the dangers of office romances ending, off-color jokes, and perceptions by third parties. <u>Cf.</u> **<u>Cronquist</u>**, 237 F.3d at 928 (finding that plaintiff's reference to infractions by male officers did not carry her burden of showing that such officers were similarly situated – she "alone was found to have committed three separate acts of harassment against three different officers" – and relevant inquiry was whether her employer believed she committed those three acts).

Of particular significance in these disparities is the presence of different decision makers. "'When different decision-makers are involved, two decisions are rarely similarly situated in all relevant respects.'" **<u>Britton</u>**, 244 F.3d at 998 (quoting <u>Harvey</u>, 38 F.3d at 972).

The question whether a different course of action should have been followed in Adams' and Zalis' attempts to calm the tempestuous waters following the end of Cook's and Plaintiff's affair is not the question before the Court. "'Federal courts do not sit as a super-personnel department that reexamines an entity's business decisions. . . . Rather, our inquiry is limited to whether the employer gave an honest explanation of its behavior.'" **<u>Harvey</u>**, 38 F.3d at 973 (quoting <u>Elrod v. Sears, Roebuck & Co.</u>, 939 F.2d 1466, 1470 (11th Cir. 1991) (alteration in original). Defendants have given an explanation of their behavior; however, Plaintiff has failed to come forward with any evidence that sufficiently challenges the honesty of that nondiscriminatory explanation.

Count II: Retaliation.  Plaintiff further argues that the non-renewal of her contract was in retaliation of an oral complaint of gender discrimination that she made on November 22, 2002, in the presence of Adams and Zalis.

Again, there is no direct evidence of discrimination; consequently, the first question is "whether [Plaintiff has] presented a prima face case of retaliation, next whether [Defendants] rebutted the resulting presumption of retaliation by advancing a legitimate reason for [their] challenged behavior, and finally whether [Plaintiff] refuted [Defendants'] proffered reason with sufficient evidence of pretext."[18] **Eliserio v. United Steelworkers of America Local 310**, 398 F.3d 1071, 1078 (8th Cir. 2005) (alterations added).  "To make a prima facie case of retaliation against an employer, a claimant must show that (1) [s]he engaged in protected conduct by either opposing an act of discrimination made unlawful by [MHRA] or participating in an investigation under [MHRA]; (2) [s]he suffered an adverse employment action; and (3) the adverse action was causally linked to the protected conduct." **Id.** at 1078-79 (alterations added).  "Once the prima facie case is made, [the employer] must articulate a legitimate, nondiscriminatory reason for its actions." **Kratzer v. Rockwell Collins, Inc.**, 398 F.3d 1040, 1048 (8th Cir. 2005) (alteration added).  "[The employer] need not prove the absence of a retaliatory motive, only enough to dispel the inference of retaliation." **Id.** (alteration added).  "The burden then shifts to [the plaintiff] to establish that the alleged legitimate, nondiscriminatory reason for dismissal was a pretext." **Id.** (alteration added).  To satisfy this burden in the context of a properly supported motion for summary

---

[18]Again, the same standards that govern Title VII retaliation claims apply to such claims brought pursuant to the MHRA.  **Buettner**, 216 F.3d at 714.

judgment, the plaintiff must "identify specific facts in the record showing that the offered reason was merely pretext and that illegal retaliation was the true motivating factor." **Crossley v. Georgia-Pacific Corp.**, 355 F.3d 1112, 1113 (8th Cir. 2004) (per curiam). "Merely disputing [the employer's] reason is insufficient[.]" **Stuart**, 217 F.3d at 634 (alterations added). As with claims of gender discrimination, "'[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.'" **Cherry**, 361 F.3d at 478 (quoting Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 251 (1981)) (alteration added).

The first element of the prima facie case requires that Plaintiff show that she engaged in protected conduct. "[A]n informal or formal complaint about, or other opposition to, an employer's practice or act may be protected if the employee reasonably believes such an act to be a violation of the statute in question." **Sherman v. Runyon**, 235 F.3d 406, 409 (8th Cir. 2000) (alteration added). "A finding of unlawful retaliation . . . is not conditioned on the merits of the underlying discrimination complaint," **Buettner**, 216 F.3d at 714 (alteration added); thus, "[a] plaintiff need not establish the conduct which she opposed was in fact discriminatory but rather must demonstrate a good faith, reasonable belief that the underlying challenged conduct violated the law," **id.** See also **Foster v. Time Warner Entm't Co.**, 250 F.3d 1189, 1195 (8th Cir. 2001) (noting that "[p]roof of a retaliation claim is not the same as a direct claim" of discrimination). Consequently, the Court's finding that Plaintiff has failed to establish a submissible claim of gender discrimination does not automatically preclude such a claim of retaliation. Additionally, "[a] plaintiff must show the employer had actual or constructive knowledge of the protected activity in order to establish a prima facie

case of retaliation." **Buettner**, 216 F.3d at 715 (alteration added). Adams and Zalis dispute that Plaintiff complained of gender discrimination in their presence; however, for purposes of the instant motion, the Court will assume that such a complaint was made and was made in good faith.

It is undisputed that the non-renewal of her contract was an adverse employment action. Plaintiff has also established the second element of a prima facie case.

The remaining element of a prima facie case is a causal connection between that non-renewal and the protected activity.

"[W]hat is meant by 'causal link' . . . is a showing that an employer's retaliatory motive played a part in the adverse employment action." **Kipp v. Missouri Highway and Transp. Comm'n**, 280 F.3d 893, 896 (8th Cir. 2002) (alterations added; interim quotations omitted). "[E]vidence that gives rise to an inference of such a motive is not only sufficient to prove a causal link but is also necessary." **Id.** (alteration added). "The requisite causal connection may be proved circumstantially by showing the discharge followed the protected activity so closely in time as to justify an inference of retaliatory motive." **Buettner**, 216 F.3d at 715-16. "Generally, however, more than a temporal connection between the protected activity and an adverse employment action is required to show a genuine factual issue on retaliation exists." **Id.** at 716. See also **Eliserio**, 398 F.3d at 1079 (same holding); **Kipp**, 280 F.3d at 897 ("Our recent cases have, in our view, made clear that a 'mere coincidence of timing' can rarely be sufficient to establish a submissible case of retaliatory discharge."). But cf. **Smith v. Allen Health Sys., Inc.**, 302 F.3d 827, 832 (8th Cir. 2002) (noting that "even without a pattern, [the Eighth Circuit has] sometimes held that the timing of one incident of adverse

employment action following protected activity sufficed to establish causal connection");

**Bassett v. City of Minneapolis**, 211 F.3d 1097, 1105 (8th Cir. 2000) (noting two cases in which a temporal link between protected activity and adverse employment action had been sufficient to create an inference of retaliation). "Although it is difficult to find a principle neatly explaining why each of [the Eighth Circuit's] cases held temporal connection was or was not sufficient to satisfy the causation requirement, it appears that the length of time between protected activity and adverse action is important." **Smith**, 302 F.3d at 833 (alteration added). See also **Clark County School Dist.**, 532 U.S. at 273 (noting that "[t]he cases that accept mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action as sufficient evidence of causality to establish a *prima facie* case uniformly hold that the temporal proximity must be 'very close'") (emphasis added); **Simon v. Simmons Foods, Inc.**, 49 F.3d 386, 390 (8th Cir. 1995) (finding that suspension of employee "just hours" after meeting with government investigator, a protected activity, and discharge 11 days later "suggest[ed] the presence of at least a partially retaliatory motive"). In other words, "temporal proximity rises in significance the closer the adverse activity occurs to the protected activity. The further in proximity the decision to terminate is from the protected activity, the less suspect the decision to terminate becomes." **EEOC**, 335 F.3d at 774.

Plaintiff contends that proximity between her complaint of gender discrimination on November 22, 2002, and the Board's decision on January 23, 2003, not to renew her contract is sufficiently close to establish a causal link between the two.[19]

The Court disagrees.  See **Smith**, 302 F.3d at 833 (holding that 13 day gap between protected activity and discharge "barely" sufficient to establish causation element of prima facie case and noting that this holding was consistent with McDonnell Douglas requirement of only "a minimal showing before requiring the employer to explain its actions").  However, even were the Court to find the temporal proximity sufficient, see **Stevens**, 97 F.3d at 271 (assuming, without deciding, that causal connection was established by temporal proximity between filing of sex discrimination complaint by employee of 18 ½ years and her discharge less than three months later), the Court finds the evidence that the Defendants' proffered reasons, outlined above, for her discharge sufficient to carry their burden of production.

As with Plaintiff's claim of gender discrimination, "[t]he question is whether [Defendants'] denials and justifications were a pretext for retaliation, not whether [Plaintiff] actually did what [s]he was accused of doing or whether discharge was warranted."  **Grey v. City of Oak Grove, Mo.**, 396 F.3d 1031, 1035 (8th Cir. 2005) (alterations added).  See also **Scroggins v. Univ. of Minn.**, 221 F.3d 1042, 1045 (8th Cir. 2000) (affirming district court's rejection of retaliation claim by employee who disputed that he was sleeping on the job and noting that relevant inquiry was whether employer "'*believed*" he had been); **Stuart**,

---

[19]Plaintiff also alleges in her first amended complaint that Defendants' failure to consider her for subsequent vacant principal positions is also in retaliation for her complaint of gender discrimination.  This allegation is unavailing for the same reasons as is her primary claim of retaliation.

217 F.3d at 637 ("The core question in a retaliation case does not, ultimately, concern the veracity of the facts underlying an employer's legitimate nondiscriminatory reason for discharging its employee, but rather concerns whether the employment decision was based upon intentional discrimination." (interim quotations omitted)).

Plaintiff contends that the temporal proximity between her complaint and the adverse employment action *together with* her positive evaluations and record as a principal sufficiently establishes a causal link between the two events to defeat Defendants' motion for summary judgment.

The Court agrees that Plaintiff received positive evaluations in the years before the 2002/03 academic year. It is the events of that year, however, that Defendants cite as the basis for not renewing her contract. As discussed above, Plaintiff has failed to establish that Defendants' interpretation of those events was pretextual. See **Erickson**, 271 F.3d at 730 (affirming grant of summary judgment to employer whose work-quality reason for demoting plaintiff was not refuted by plaintiff's evidence that he had had a record of satisfactory sales figures and performance evaluations because this record was achieved in a position that he did not hold at time of demotion); **Buettner**, 216 F.3d at 717 (finding that plaintiff's references to her abilities, the type of work she performed, and her position for advancement did not refute employer's assertion that she was discharged for cost and efficiency purposes, and her allegations about the workload after she was discharged were relevant to whether employer had made a good or poor business decision, but did not establish pretext); **Rose-Maston v. NME Hospitals, Inc.**, 133 F.3d 1104, 1109 (8th Cir. 1998) (affirming grant of summary judgment to employer in discrimination claim filed by employee who argued that

her prior satisfactory evaluations supported an inference of pretext because they contradicted employer's position that she was incompetent, prior evaluations did not render recent, negative evaluations inherently untrustworthy); **Rath v. Selection Research, Inc.**, 978 F.2d 1087, 1090 (8th Cir. 1992) (finding that former employee's references to his compensation and sales did not address cited reason for his discharge, an inability to work effectively with others). Rather, the evidence is that Defendants concluded, in good faith, that Plaintiff had violated Board policy. "Although contesting an unlawful employment practice is protected conduct, the anti-discrimination statutes do not insulate an employee from discipline for violating the employer's rules or disrupting the workplace." **Kiel**, 169 F.3d at 1136. See also **Shanklin v. Fitzgerald**, 397 F.3d 596, 604 (8th Cir. 2005) ("[F]iling a complaint does not clothe [the plaintiff] with immunity for past and present inadequacies, [and] unsatisfactory performance." (all but last alteration added)).

"In the end, [Plaintiff] has only the bare fact that she was [not renewed] and this alone is not enough to preclude summary judgment" on her retaliation claim. **Stevens**, 97 F.3d at 272 (alteration added). See also **Luciano**, 259 F.3d at 910 (concluding that general statements by plaintiff that he had been "set up" were insufficient to defeat properly-supported motion for summary judgment); **Buettner**, 216 F.3d at 718 (rejecting as "pure speculation" plaintiff's claim, unsupported by any evidence, that supervisor wanted to get rid of her because her filing of discrimination complaint would jeopardize his advancement); **Rose-Maston**, 133 F.3d at 1109 (affirming grant of summary judgment after plaintiff failed to establish former employer's nondiscriminatory reason for firing her was pretextual; plaintiff "point[ed] to no specific factual evidence supporting her claim, choosing instead to

rely upon bald assertions of favoritism"); **Nelson v. J.C. Penny Co.**, 75 F.3d 343, 346 (8th Cir. 1996) ("A fact finder may not simply convert a condition that is necessary for a finding of liability . . . into one that is sufficient for such a finding."  (alteration added)).

Count III: Malicious Prosecution.  Plaintiff argues in Count III that Defendants are liable for malicious prosecution for abandoning the charges against her before the scheduled hearing.

Under Missouri law, the elements of a malicious prosecution claim are "(1) the commencement of a prosecution against the plaintiff; (2) instigated by the defendant; (3) termination in favor of the plaintiff; (4) want of probable cause by the prosecution; (5) defendant's conduct was actuated by malice, and; [sic] (6) plaintiff was damaged." **Duvall v. Lawrence**, 86 S.W.3d 74, 84 (Mo.Ct.App. 2002) (interim quotations omitted).  Because malicious prosecution actions "have never been favorites of the law[,]" Plaintiff must establish each of the six elements by "strict and clear proof."  **Holley v. Caulfield**, 49 S.W.3d 747, 750 (Mo.Ct.App. 2001) (alteration added; interim quotations omitted).  Plaintiff may not rely on speculation to establish any of the requisite elements.  **Id.**; **Davis v. Board of Educ. of the City of St. Louis**, 963 S.W.3d 679, 684 (Mo.Ct.App. 1998).

The issuance of the Statement of Charges led to a hearing on those charges being scheduled by the Board to determine their merit.  The Court assumes, without deciding, that the anticipated proceedings before the Board satisfies the first element.  See **Misischia v. St. John's Mercy Med. Ctr.**, 30 S.W.3d 848, 862 (Mo.Ct.App. 2000) (holding in dicta that "[t]he term 'administrative proceeding' means a proceeding before a public agency or public corporation for purposes of malicious prosecution claims[.]").  But cf. **Davis**, 963 S.W.3d

at 685 (noting that "no Missouri court has recognized a claim for malicious prosecution premised on an administrative proceeding" but declining to reach issue of whether hearing before Board of Education stated a claim and addressing remaining elements of prima facie case).

The Court also finds the second element – instigation by Defendants – to be satisfied. "Instigation requires proof that the plaintiff stimulated, promoted or encouraged the specific action taken. Mere passive knowledge of or acquiescence in the acts of another is not sufficient." **Pernoud v. Martin**, 891 S.W.2d 528, 536 (Mo.Ct.App. 1995) (interim citation omitted). Defendants argue that Adams instigated the proceedings because they resulted from his issuance of the Statement of Charges, citing **Davis**, 963 S.W.2d at 686 ("[W]here a document is filed with an agency that which document initiates a contested proceeding, a defendant has instigated an action."). Any culpability of Adams for issuing the Statement does not translate into a holding that the Board did not also instigate the proceedings it scheduled before it. See Mo.Rev.Stat. § 168.101 (governing employment rights of principals, including when a right to a hearing attaches). For purposes of the instant motion, the Court will assume that the Board did initiate the proceedings.

The third element is the termination of the proceedings in favor of Plaintiff. The scheduled hearing was cancelled after the Board voted, on Adams' recommendation, not to renew her contract for the following academic year. Withdrawal of an action by the instigator may be a favorable result. See **Turman v. Schneider Bailey, Inc.**, 768 S.W.2d 108, 113 (Mo.Ct.App. 1988). See also **Stevens v. Redwing**, 146 F.3d 538, 546 (8th Cir. 1998) (finding that under Missouri law dismissal of an action without prejudice may be

considered a termination in favor of the defendant for purposes of a malicious prosecution claim if the party who initiated seminal action manifests an intent to abandon it). The Board elected not to renew Plaintiff's contract for the following academic year and to pay her her remaining salary for the then-current academic year rather that pursue her termination. The Court finds that the Board did abandon the proceedings.

The fourth element is the lack of probable cause for the underlying action. "The Missouri Supreme Court has defined probable cause for the institution of a civil action to consist of: (1) the plaintiff's belief in the facts alleged, (2) based on sufficient circumstances to reasonably induce such belief by a person of ordinary prudence in the same situation, plus (3) a reasonable belief that under the facts the claim may be valid under the applicable law." **Holley**, 49 S.W.3d at 751 (citing Haswell v. Liberty Mut. Ins. Co., 557 S.W.2d 628, 633 (Mo. 1977) (en banc)). "[P]robable cause does not depend upon what may have ultimately been proved to be the actual facts embraced in the previous action, but instead upon a reasonable belief of the one who instituted the prosecution." **Id.** (alteration added). In the context of an administrative proceeding, "probable cause is a belief 'that the charge or claim on which the proceedings are based may be well founded[.]'" **Davis**, 963 S.W.3d at 687 (quoting Rest. Torts Second Section 680(a)). Additionally, the lack of probable cause must be shown in respect to the entire proceeding. **Joseph P. Held & Assocs. v. Wolff**, 39 S.W.3d 59, 63 (Mo.Ct.App. 2001). "The plaintiff does not meet [her] burden by showing the defendant's lack of probable cause in one of the number of theories underlying the proceeding where other theories are supported by probable cause." **Id.** (alteration added; interim quotations omitted).

As noted by Defendants, Adams issued the document which led to the initiation of the proceedings to terminate Plaintiff's contract.  As noted in the discussion above, Plaintiff has come forward with no evidence to create a genuine issue of material fact about whether Adams believed her, in good faith, to have violated her duties and responsibilities as a building principal.  Moreover, as noted by Defendants when addressing the third element of a prima facie case, it was the Statement of Charges issued by Adams that caused the Board of Education to schedule a hearing.  The Statement sufficiently outlined the allegations against Plaintiff, and there is no evidence that the Board did not rely on that Statement in good faith.  Thus, the Statement of Charges supplied the probable cause for the initiation of the administrative proceedings against Plaintiff.

The fifth element requires a showing of malice.  "A plaintiff suing for malicious prosecution must prove legal malice, i.e. that the defendant initiated the prosecution for a purpose other than that of bring an offender to justice."  **Bramon v. U-Haul, Inc.**, 945 S.W.2d 676, 684 (Mo.Ct.App. 1997).  "Malice may be inferred from the absence of probable cause."  **Turman**, 768 S.W.2d at 112.  Plaintiff has not shown a lack of probable cause.  Nor has she shown that the Board initiated the administrative proceedings for any other purpose than to terminate the employment of a principal based on allegations by the District superintendent that she was not properly fulfilling her duties and responsibilities.

Because Plaintiff has, at a minimum, failed to establish the fourth and fifth elements of a prima facie case of malicious prosecution, Defendants will be granted summary judgment on this claim.

Count IV: Prima Facie Tort.  In her fourth and final count, Plaintiff argues, alternatively to Count III, if it is not malicious prosecution for Defendants not to hold the scheduled hearing on the Statement of Charges then it is a prima facie tort because they did so for an improper purpose.

"Under Missouri law, prima facie tort has the following elements: (1) intentional lawful act by the defendant, (2) an intent to cause injury to the plaintiff, (3) injury to the plaintiff, and (4) an absence of any justification or an insufficient justification for the defendant's act."  **Kelly v. Golden**, 352 F.3d 344, 350 (8th Cir. 2003).  See also **Rice v. Hodapp**, 919 S.W.2d 240, 245 (Mo. 1996) (en banc) (same).  "The tort is recognized in those cases in which it is necessary for the courts to respond to the needs of society and to provide equity when a party has no other tort remedy."  **Kelly**, 352 F.3d at 350-51.  "The Supreme Court of Missouri has[, however,] noted that it is difficult to find any reported cases in which a recovery for prima facie tort has been established."  **Id.** at 351 (alteration added).

Again, there is no evidence that the Board had any intent to injure Plaintiff.  In support of her claim of an improper purpose, Plaintiff cites portions of an affidavit by an attorney who represented her at the time.  These portions include only hearsay and are, consequently, not to be considered in this summary judgment proceeding.  Additionally, the Court notes that the evidence is undisputed that Adams issued the Statement of Charges that resulted in the Board action, not Defendants as alleged by Plaintiff.

Motion to Strike.  Defendants move to strike Plaintiff's response to their statement of uncontroverted material facts and those affidavits and any deposition testimony submitted in her memorandum in response to its motion for summary judgment that do not comply with

Rule 56 and Local Rule 7-4.01 of the United States District Court for the Eastern District of Missouri.

Defendants correctly note that affidavits to be considered on summary judgment must be "made on personal knowledge setting forth such facts as would be admissible in evidence[.]" **Shanklin**, 397 F.3d at 602 (alteration added; interim quotations omitted). <u>See also</u> **Cronquist**, 237 F.3d at 927 ("[Plaintiff's] reliance on affidavits based on hearsay cannot defeat a motion for summary judgment."). Additionally, Local Rule 7-401(E) requires that factual matters in dispute "be set forth with specific references to portions of the record."

In ruling on Defendants' motion for summary judgment, the Court has not considered any evidentiary allegations that would not be admissible as evidence. Nor as the Court considered any misplaced or improper arguments, by either party. Defendants' motion to strike will be denied.

## Conclusion

For the reasons set forth, summary judgment will be entered in favor of defendants Rolla 31 Public School District, Dana Rapier, Frank Blum, Jim Burns, Ralph Wilkerson, Annie Bass, and Keith Stassner and against plaintiff Lynne Reed.[20]

Accordingly,

**IT IS HEREBY ORDERED** that Plaintiff's claims against defendant Melanie Hopper are DISMISSED.

---

[20]Because the Court finds that Plaintiff has failed to refute Defendants' nondiscriminatory reasons for the non-renewal of her contract and to establish a prima facie case on her two state tort claims, the Court declines to reach the issue of the individual liability of the Board members.

**IT IS FURTHER ORDERED** that the motion for summary judgment of defendants Rolla 31 Public School District, Dana Rapier, Frank Blum, Jim Burns, Ralph Wilkerson, Annie Bass, and Keith Stassner is **GRANTED**.  [Doc. 61]

**IT IS FINALLY ORDERED** that the motion of Defendants to strike Plaintiff's Response to Defendants' Statement of Uncontroverted Material Facts and portions of affidavits and deposition testimony submitted with her memorandum in opposition to Defendants' motion for summary judgment is **DENIED**.  [Doc. 83]

An appropriate Judgment shall accompany this Memorandum and Order.


/s/ Thomas C. Mummert, III
THOMAS C. MUMMERT, III
UNITED STATES MAGISTRATE JUDGE

Dated this 1st day of July, 2005.